UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
EVELYN A. JANKOUSKY,

                Plaintiff,

     -against-

NORTH FORK BANCORPORATION INC.,
CAPITAL ONE, FINANCIAL CORP, CAPITAL
ONE, NATIONAL ASSOCIATION, and
NORTH FORK BANK,

                Defendants.
-------------------------------------------------------------x

ECF CASE

Index No.: 08 CV-01858 (PAC)

AFFIDAVIT IN OPPOSITION
TO PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
AND IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT

Thomas Pfundstein, being duly sworn, deposes and says:

1. I am a senior vice president of defendant, Capital One, NA, "Bank" and held the same position at North Fork Bank, "NFB" (a bank merged into the Bank) during, inter alia, 2004-2007. My duties while at NFB included the administration of incentive compensation plans, including but not limited to the 2006 Incentive Compensation Plan for Branch Managers, the "Plan", at issue in this litigation. I make this Affidavit in opposition to plaintiff's motion for partial summary judgment and in support of the Bank's cross-motion for partial summary judgment. I have knowledge of the facts set forth herein.

### THE PLAN

2. During 2004-2007 NFB maintained a series of incentive compensation plans, the purpose of which was to provide incentive for employees in certain positions to perform in various ways seen to be beneficial to NFB and to reward such performance in a variety of ways. The Plan was among these various incentive compensation plans and was designed for branch managers and assistant managers. A copy of the Plan is annexed hereto and incorporated herein as Exhibit A. There were other incentive plans for a variety of other classes of employees,

including but not limited to private bankers, district managers, tellers, various loan officers and various sales positions.

3. The purpose of the Plan, as stated therein, was to . . . "grow branch profits by increasing deposits, increasing fee income, decreasing expenses, and referring business to other Departments thereby ensuring the maximization of long term shareholder value" (Plan, p.2) Only the "increases in deposits" is in issue in this litigation. The Plan consisted of four components: Bonus, servicing, super bonus, and service shop. Only the bonus portion of the Plan is in issue in this litigation. (Plan, p. 2) The bonus portion of the Plan consisted of four components: Non-Public Demand Deposit Account (DDA) Deposit Growth, Non-Public Core Interest Bearing Account (IBA) Deposit Growth, Banking Fee Income and North Fork Financial Advisors (NFFA) Fee Income, and Expenses. Only the Demand Deposit Account ("DDA") deposit growth component is in issue in this litigation.

4. Deposit accounts were and are governed by Federal Regulation D, 12 CFR Part 204, "Reg. D"). Reg. D provides for, inter alia, the attributes of the types of deposit accounts and required reserves to be maintained by a bank against such deposits. The more freely and easily funds may be withdrawn, the greater the reserve requirement. DDA deposits are non-interest bearing checking deposits. A customer may write checks against and otherwise make withdrawals or transfers in an unlimited number on a DDA account. Interest bearing deposits, and, in particular, money market accounts, a type of savings account, are those that bear interest. A money market account has strict limitations on the number of withdrawals or transfers per statement cycle – six (and no more than three by check), with certain exceptions, if permitted by the bank e.g., in person transactions. A copy of the NFB operations manual, which governs transactions in money market accounts is annexed hereto and incorporated herein as Ex. B.

5. The Plan provides for incentives based upon average deposit growth on an annual basis. Different rates of incentive are applied to different types of accounts. DDA account growth may result in incentives from 0.25% to 0.55%. As provided in the Plan, all deposit data are year-to-date averages as calculated by the Budget process. Incentive awards for employees who have been given a written warning may be suspended or forfeited at Management's discretion, and Management could modify the Plan at any time.

### PLAN ADMINISTRATION

6. My department generated monthly reports, "Reports," with respect to each potential recipient of monies under the Plan i.e., each branch and its manager and its assistant managers reflecting the progress, if any, which was apparently made toward achieving incentives at the time of the Report by reason of various incentive components. Of course, these interim Reports containing year-to-date averages could and did change for a variety of reasons. At the end of the year a Report with yearly averages would be generated for review and approval of senior management. Incentive would be earned when so reviewed and approved.

7. My department regularly generated summaries of Reports for my review and thereafter for senior management review. Anything unusual would be investigated and ultimately brought to the attention of senior management if warranted.

### PLAINTIFF'S UNUSAL BRANCH ACTIVITY

8. During 2006 I noticed an unusually large interim figure for branch incentives and DDA growth in plaintiff's branch. As a result thereof, I caused an investigation to be made as to the reason for the unusually large figure. As a result of the investigation it was discovered that there was a very large discrepancy between DDA accounts balances and interest-bearing accounts balances. Further investigation into the cause of the discrepancy was conducted. As a

result of further investigation it was determined that a particular customer of plaintiff's branch maintained a large money market account. This account was established in October, 2003. During 2005 significant deposits were made to this account which doubled the deposit base of the branch and resulted in maximum incentive compensation being paid in 2005 for interest bearing accounts. The incentive measures for 2006 were based upon these 2005 figures. However, this account was utilized by the customer as its transaction account rather than a DDA account. The customer exceeded the transactions limits provided by Reg. D. As a result of this violation of Reg. D a change in the structure of that customer's accounts and usage had to be made.

9. The change that was made was to convert the money market account to a demand deposit account. The money market account had an average balance of $150,000,000 through March, 2006 and an actual balance of approximately $40,000,000 at the time of change. Thus, the change from money market to DDA initially caused the computer to see large increase in average year-to-date DDA deposits and a large decrease in average money market account deposits. This account-type change was unusually large and markedly different from actual day-to-day transfers from money market accounts to DDA accounts which some customers made to pay bills. By the end of 2006 the average balance in the account for the period April, 2006 – December, 2006 was approximately $24,800,000.

<u>ADJUSTMENT CONSISTENT WITH THE PLAN AND REGULATIONS</u>

10. When the entire nature of the situation was understood I contacted Paul Santamaria, plaintiff's immediate supervisor to advise him of the situation and seek direction. I also spoke with Joseph Roberto, Paul Santamaria's supervisor. Further discussions were held. As a result, a determination was made to adjust the balances in the money market account and DDA to account

4

for the account-type change required to comply with Reg. D. DDA average balances were reduced and money market average balances increased by a similar amount to this account was equal to the average balance in the account since April, 2006, the time the account was converted DDA. The determination was made by Joseph Roberto and approved by Carolyn Drexel, Joseph Roberto's supervisor and head of the branch system.

11. The average balance upon which DDA incentive was not paid (but IBA incentive was paid) was approximately $24,800,000. Applying a tier 4 incentive to this amount under the Plan would have yielded branch incentive of an additional $136,400 to be shared by plaintiff and her two assistants.

12. The reasons for the decision were to reflect the fact that no new deposits were brought into the branch to reflect that incentive had been paid on the funds, and to reflect that the reclassification was due to regulatory requirements and not any effects of the branch. As the change was required by law and the stated goal of the Plan was to increase deposits and no increase in deposits occurred, the adjustment was proper.

WHEREFORE, it is respectfully requested that the motion for partial summary judgment be denied and the Bank's motion for partial summary judgment granted.

Dated: Melville, New York
August 12, 2010

_____
Thomas Pfundstein

Sworn to before me this
12 day of August, 2010

_____
Notary Public

ERIC JONATHAN BRESSLER
Notary Public, State of New York
No. 02BR4622371
Qualified in Suffolk County
Term Expires March 30, 2011