USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 23, 2011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
:
EVELYN A. JANKOUSKY, :
: 08 Civ. 1858 (PAC)
        - against - :
: OPINION & ORDER
:
NORTH FORK :
BANCORPORATION, INC., et al., :
:
                      Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

      Plaintiff Evelyn Jankousky moves for partial summary judgment on her claims that Defendant Capital One, National Association ("Bank") breached her contract and violated New York Labor Law ("NYLL") by reducing, and then failing to pay altogether, her contractually guaranteed incentive compensation for 2006. She also argues that there is no genuine dispute that this violation was willful, entitling her to liquidated damages. The Bank cross moves for summary judgment on these claims, as well as the related common law claims and sex discrimination claims. It argues that it complied with the contract's unambiguous terms and had a legitimate, nondiscriminatory reason to terminate Jankousky.

      As to the NYLL claims for both the incentive reduction and failure to pay, the Court denies Jankousky's motion for summary judgment and grants the Bank's motion for summary judgment. Jankousky's claims do not involve a deduction within the meaning of the statute. As to the breach of contract claims for both the reduction and the failure to pay, the Court grants Jankousky's motion for summary judgment and denies the Bank's motion for summary judgment. Unambiguous language of the contract mandates this result; and there is no evidence to support the Bank's contrary interpretation. Accordingly, the Court dismisses the duplicative claim for breach of the implied covenant of good faith and fair dealing. The claims for promissory estoppel,

quantum meruit, and unjust enrichment are all preempted by the contract governing Jankousky's right to the incentive compensation and, therefore, they are dismissed as well. Finally, the Court denies the Bank's motion for summary judgment on the sex discrimination claims because genuine factual disputes remain.

**I.  Facts**

The Bank is a federally insured financial institution and successor by merger to North Fork Bank. (Def.'s Mem. 3). Jankousky was a branch manager at the Bank since 2001, and managed the Fifth Avenue branch from 2004 until she was terminated in March 2007.  (Pl. 56.1 ¶1). As branch manager of the Fifth Avenue branch, Jankousky was supervised by the district manager—Penelope Wamboldt until 2006, when she was replaced by Paul Santamaria. Joseph Roberto was the division manager, and Carolyn Drexel managed the branch system. (Def.'s Mem. 3).

The Bank rewards branch managers for increasing profitable deposits, so Jankousky's compensation included substantial incentive compensation based on "the full amount of actual dollar growth" at the branch in certain types of accounts over the prior year, as provided by written contract.[1] (Goodell Aff. Ex. 6, at 388). The 2006 Retail Incentive Programs ("Contract") governs the present claim. It provides a few limited scenarios in which the actual dollar growth may be adjusted:

> There will be no adjustments made for deposits under $500,000 that are moved to another branch. Adjustments will be considered for deposits over $500,000 that are moved to another branch, losses that result from a robbery, or other unforeseen losses that occur through no fault of the branch . . . .

(Id. at 395 ¶ 8). It further states that "[i]ncentive awards for employees who have been given a written warning . . . may be suspended or forfeited at Management's discretion." (Id. at 395 ¶10).

---

[1] For example, in 2006, Jankousky earned about $125,000 in base salary plus over $83,000 in incentive pay based on her performance in 2005.

Finally, in relevant part, it provides that "[a]s of December 31, 2006, the results will be calculated and the appropriate incentive will be earned," but that "[a]ll incentives will be paid in February 2007." (Id. at 394 ¶2, 395 ¶3).

From 2004 to 2006, the total deposits at Jankousky's branch grew from $250 million to $400 million. (Pl. Opp. 56.1 ¶ 105). In 2006, the deposit growth in the most profitable accounts (checking or Demand Deposit Accounts ("DDA")[2]) at her branch was in the top 10% for all Bank branches. (Pl. 56.1 ¶ 10). Additionally, Jankousky's branch had less than $18,000 in 2006 losses, which was relatively low, and the branch never failed an audit. (Goodell Aff. Ex. 23; Pl. Opp. 56.1 ¶¶ 110-12).

During Jankousky's tenure as branch manager, the Fifth Avenue branch held a large money market account ("MMA"), which is interest-bearing, for a certain customer ("Customer L"). It was discovered that Customer L used its MMA for transactions which exceeded the limits of Federal Regulation D. In April 2006, the MMA was changed to a DDA in order to comply. No new money was brought into the branch, but the account type changed from interest-bearing to non-interest-bearing. (Def.'s Mem. 3).

According to Thomas Pfundstein, the Bank's executive in charge of incentive compensation, in Fall 2006, the Bank decided to investigate the amount of incentive compensation that Jankousky was supposed to receive because it was unusually large. (Pfundstein Aff. ¶ 8). In November 2006, the Bank adjusted her incentive pay by removing Customer L's transfer from the total DDA deposit growth, because the money was not new to the branch; had already been subject to the 2005 incentive compensation; and was transferred only in order to comply with the law ("November Incentive Reduction"). (Id.). Jankousky alleges that this decision had the effect of

---

[2] DDA accounts earn the highest incentive percentages because they are not interest bearing and, therefore, are the most profitable to the Bank. (Goodell Aff. Ex. 6, at 388).

reducing her 2006 incentive compensation by $89,780, resulting in a new total of $83,456. (Pl. 56.1 ¶¶ 32-33).

In January 2007, Jankousky received and signed a written performance warning, suspending the remaining incentive compensation of $83,456 altogether "pending a satisfactory rating on a follow-up performance evaluation, which will be conducted in three months." ("January Incentive Denial"). (Pl. 56.1 ¶¶ 37-38). On February 8, 2007, Jankousky complained through counsel that the Bank violated the Labor Law and discriminated against her based on sex.[3] (Goodell Aff. Ex. 16). The Bank's officers did not investigate whether their actions complied with NYLL, (Pl. 56.1 ¶¶ 41-43, 45), and terminated Jankousky on March 12, 2007, purportedly for insubordination and violating proper banking procedures. (Def.'s Mem. 4-5).

## II. Procedural History

Jankousky commenced this action on February 25, 2008 against North Fork Bancorporation, Inc. d/b/a North Fork Bank and Capital One, Financial Corp., asserting causes of action for (1) sex discrimination under Title VII; (2) retaliation under Title VII; (3) sex discrimination under the New York State Human Rights Law ("NYHRL"); (4) retaliation under the NYHRL; (5) sex discrimination under the New York City Administrative Code ("NYCAC"); (6) retaliation under the NYCAC; (7) breach of contract (of both its express terms and the implied covenant of good faith and fair dealing); (8) promissory estoppel; (9) quantum meruit; (10) unjust enrichment; (11) NYLL §193(1); and (12) retaliation under NYLL.  The complaint was amended to add the Bank, the sole remaining defendant following the Court's March 10, 2009 dismissal of the complaint against all others.

Jankousky now moves for summary judgment as to the seventh and eleventh causes of action, arguing that the Bank breached the Contract and violated NYLL § 193(1), both by

---

[3] Jankousky never complained to her supervisors or human resources about sex discrimination. (Def.'s Mem. 5).

4

reducing and then failing to pay her incentive compensation, and that the Bank did so willfully, entitling her to liquidated damages. If her motion is granted, Jankousky also requests permission to file an application for attorney fees.

The Bank cross moves for summary judgment as to these claims, as well as the first, third, fifth, eighth, ninth, and tenth causes of action, leaving only the retaliation claims. It argues that the presence of a valid contract precludes recovery under promissory estoppel, restitution, and quantum meruit; and that the sex discrimination claims should be dismissed because there is a legitimate non-discriminatory reason for denying Jankousky's incentive compensation and terminating her.

### III. Analysis

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

### a. Cross-Motions on Breach of Contract and NYLL Claims

#### i. NYLL § 193(1)

Once wages are earned, "deductions other than those set forth in section 193 are improper." Pachter v. Bernard Hodes Grp., Inc., 891 N.E.2d 279, 284-86 (N.Y. 2008). NYLL § 193(1) provides:

5

> No employer shall make any deduction from the wages of an employee, except deductions which . . . are expressly authorized in writing by the employee and are for the benefit of the employee . . . . Such authorized deductions shall be limited to payments for insurance premiums, pension or health and welfare benefits, . . . and similar payments for the benefit of the employee.

N.Y. Lab. Law § 193(1) (McKinney 2009). "Wages" are defined as "the earning of an employee for labor or services rendered, regardless or whether the amount of earnings is determined on a time, piece, commission or other basis." Id. § 190(1). Contractually guaranteed compensation, like the incentive compensation as issue here, qualifies as a "wage" under the NYLL. See Tuttle v. George McQuesten Co., 642 N.Y.S.2d 356, 357-58 (N.Y. App. Div. 3d Dep't 1996). The compensation is "earned" according to the terms of the agreement providing for it. Pachter v. Bernard Hodes Grp., Inc., 505 F.3d 129, 134 (2d Cir. 2007); see Gennes v. Yellow Book of N.Y., Inc., 806 N.Y.S.2d 646, 647 (N.Y. App. Div. 2d Dep't 2005). The purpose of § 193(1) is to place the risk of loss for items such as damaged merchandise on the employer. See Hudacs v. Frito-Lay Inc., 683 N.E.2d 322, 325 (N.Y. 1997).

The dispute here deals with what are Jankousky's 2006 wages. The parties have different views on how the wages should be calculated. This type of dispute does not fall within NYLL § 193(1), which covers only deductions from agreed upon wages. Until the wages are agreed upon, there can be no deduction within the meaning of the NYLL. Since the NYLL has not been breached, there is no right to liquidated damages and no basis for an award of attorney fees.

### ii. Breach of Contract

In interpreting a contract, the goal is "to give effect to the intention of the parties as expressed in the unequivocal language they have employed." Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000). A contract is ambiguous if it is susceptible to more than one reasonable interpretation. See, e.g., In re Progressive Ins. Cos., 834 N.Y.S.2d 394, 396 (N.Y. App. Div. 3d

Dep't 2007); 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co., 815 N.Y.S.2d 507, 511 (N.Y. App. Div. 1st Dep't 2006). Whether a contract is ambiguous is a question of law for the court. Cont'l Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010). "If the contract is unambiguous, its meaning is likewise a question of law for the court to decide," JA Apparel Corp., 568 F.3d at 397, objectively by looking to the language of the contract.  See Cutter v. Peterson, 203 A.D.2d 812, 814 (App. Div. 3d Dep't 1994); Klos v. Lotnnicze, 133 F.3d 164, 168 (2d Cir. 1997).  When interpreting an unambiguous contract, "the court is to consider its '[p]articular words' not in isolation 'but in light of the obligation as a whole and the intention of the parties manifested thereby.'"  JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) (quoting Kass v. Kass, 91 N.Y.2d 554, 566 (1998)).  A contract should not be interpreted so as to render a clause superfluous or meaningless, Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992), and any ambiguity must be construed against the drafter. See Computer Assoc. Intl, Inc. v. U.S. Balloon Mfg. Co., Inc., 782 N.Y.S.2d 117 (N.Y. App. Div. 2d Dep't 2004).

### iii. November Incentive Reduction

Jankousky argues that it is undisputed that the Bank did not calculate her incentive compensation based on the full amount of dollar growth, as plainly required by the Contract. The Bank responds that, while a large transfer increased the amount of DDA deposits, it was not a new deposit, and did not qualify for incentive compensation. The plain language unambiguously supports Jankousky's interpretation. Even if this interpretation has such undesirable consequences (that is, the double incentive for intra-branch transfers) that render it unreasonable and the Contract ambiguous, the Bank has offered no evidence to create a genuine dispute as to its intended meaning.

The Contract requires the Bank to pay incentive compensation based on "the full amount of dollar growth" of the DDA accounts at the branch. (Goodell Aff. Ex. 6, at 388).  It makes no

7

distinction for new deposits or intra-branch transfers. Moreover, in contrast to the Bank's assertions, it mentions only "branch profits" and "increasing deposits," not "branch deposits." (Def.'s Reply 2; Goodell Aff. Ex. 6, at 387). It is silent as to adjustments for transfers of funds between different types of account within a branch, despite expressly providing for adjustments in cases of inter-branch transfers, robberies, and other unforeseen losses.[4]

Jankousky's interpretation is reasonable in light of the Contract's plain language. The Bank argues that Jankousky's interpretation leads to the unintended result that she may receive double compensation for the same money deposit—first when it was initially deposited in the MMA and then when it was transferred to the DDA.[5] Under the Bank's interpretation, however, Jankousky would not be compensated for the fact that the transfer to the DDA reduced expenses and increased profitability; in other words, the plan would provide no incentive to move deposits into interest-free accounts. Moreover, the Bank's fear of a double incentive seems to be unfounded even under Jankousky's interpretation. While she would indeed be compensated for the initial deposit, as well as the new deposit, post-transfer, the transfer would simultaneously effectuate a reduction in MMA growth, denying compensation for new MMA money deposits and counter-balancing the earlier compensation for the initial MMA deposit.[6]

---

[4] Additionally, this adjustments clause seems to contemplate only upward adjustments so that managers are not penalized for certain deposit losses that are out of their control.

[5] The Contract provides for incentive compensation for Non-Public DDA Deposit Growth and Non-Public Core Interest Bearing Account (IBA) Deposit Growth. MMA deposit growth presumably is included in IBA deposit growth, potentially resulting in the double incentive alleged by the Bank. (Santamaria Aff. ¶5).

[6] The question really is whether "actual" somehow limits the term "growth." That is, is "actual deposit growth" determined by netting deposits against withdrawals, in which case the double incentive would be offset, or simply by summing deposits and ignoring withdrawals, risking a double incentive. The Bank has produced no evidence that "actual deposit growth" refers to a summation of every deposit without any consequence for withdrawal or other loss, as they would have to in order to create a genuine dispute as to the reasonable interpretation of this Contract. Indeed, it repeatedly uses the term "actual annual balance" as its measure. (See Santamaria Aff. ¶ 13 (stating that Customer L's transfer was subtracted from the DDA average account balance and added back to the MMA average account balance)). The undisputed evidence demonstrates that "actual deposit growth" involves the sort of netting that would offset the DDA increase by an equal decrease in MMA growth. As a result, Jankousky's interpretation would not in fact result in a double incentive, because the increase resulting from the new DDA deposit would be offset by the decrease resulting from the new MMA withdrawal.

The question then is whether the Bank's interpretation is also reasonable in light of the text, rendering the Contract ambiguous. As noted, Jankousky is correct that the plain language of the Contract does not limit the plan to compensation for new branch deposits. Rather, the Bank's argument is based on the purported objective of the incentive plan—to increase branch deposits. The Contract's stated purpose, however, is to increase profitability. Profitability is increased when expenses are reduced by moving deposits, as they were here, from interest-bearing MMAs to interest-free DDAs. The Bank's arguments are not unreasonable in the abstract, but they do not deal with the plan as written. Additionally, while both interpretations may permit unreasonable results (i.e., for Jankousky's, a possible double incentive; for the Bank's, the failure to reward profitable transfers from interest-bearing to interest-free accounts), Jankousky's has some footing in the plain language of the Contract. The Bank, on the other hand, offers no textual support for its narrower interpretation. The Bank's interpretation is consistent with the Contract only insofar as it is a subset of Jankousky's interpretation. That is "deposit growth" includes both "deposit growth" and "new deposit growth." Since the Bank cannot point to anything in the text that supports its narrower interpretation, the Contract is unambiguous.

Nor does the Bank offer any evidence of past practice regarding intra-branch transfers. For these reasons, even if the Contract were ambiguous, no reasonable jury could conclude that the Bank's interpretation of the Contract (though a smart incentive plan) is supported by the evidence. Additionally, because any ambiguity is construed against the drafter, Jankousky should prevail as a matter of law.

Without any evidence, textual or otherwise, that "actual deposit growth" contemplates only DDA deposits that are new to the branch, the Bank's motion for summary judgment on these claims fails. The Court finds that there is no genuine dispute that the Bank's reduction of the

9

incentive by $89,780[7] breached the Contract. Accordingly, the Court grants summary judgment for Jankousky as to the incentive reduction.

### iv. January Incentive Denial

Jankousky argues that her right to the incentive compensation vested on December 31, 2006 and that a subsequent written warning is insufficient to permit forfeiture. The Bank responds that the incentive compensation cannot be completed until the beginning of the following year because it requires end-of-year calculations followed by reviews and adjustments; the January 2007 warning, therefore, was sufficient to cut off Jankousky's right to incentive pay for 2006 performance.

The Contract provides the Bank's management discretion to suspend or deny incentive awards for employees who have been given a written warning. (Goodell Aff. Ex. 6, at 395 ¶ 10). This clause contemplates a prior written warning, occurring before the compensation was earned and the right thereto vested. See, e.g., Arbeeny v. Kennedy Executive Search, Inc., 893 N.Y.S.2d 39, 44 (N.Y. App. Div. 1st Dep't 2010); Tuttle v. George McQuesten Co., 642 N.Y.S.2d 356 (N.Y. App. Div. 3d Dep't 1996) (holding that a compensation plan's provision that the commission was "'due' at the end of the fiscal year in which it is 'earned'" cannot be conditioned on the worker's remaining with the company because his right to the money had already vested by the time of his resignation). The Contract provides here that the compensation is earned "as of December 31, 2006." The Bank cannot retroactively revoke the earning of this compensation by issuing a written warning in January 2007, even if it relates to conduct in 2006. Its argument that Jankousky's interpretation is illogical because the Bank would need some time at the beginning of the year to compute the prior year's totals renders the "will be earned" clause meaningless. The only reasonable interpretation of this provision, given the practical concerns raised by the Bank, is

---

[7] The Bank challenges this total but provides no alternative measure of damages. (See Santamaria Aff. ¶14).

10

that the results used in the compensation formula are calculated based on the numbers as of December 31, 2006, the date on which the incentive is earned. While calculation occurs after year end, the inputs are set in stone as of December 31, 2006. Accordingly, the Bank's denial of the reduced compensation of $83,456 violates the unambiguous terms of the Contract, and the Court grants summary judgment for Jankousky as to the incentive denial.

### b. The Bank's Motion on the Common Law Claims

The Court has granted summary judgment on the contract claim. The remaining contract claims (and claims sounding in contract) are now superfluous. The claims for breach of the implied duty of good faith and fair dealing, promissory estoppel, quantum meruit, and unjust enrichment are dismissed on summary judgment.

### c. The Bank's Motion on the Sex Discrimination Claims

Sex discrimination claims, whether brought under Title VII, NYHRL, or NYCAC[8] are analyzed under the burden-shifting analysis of McDonnell-Douglas Corp. v. Green. 411 U.S. 792, 802-05 (1973); see Thomas v. New York City Health and Hosps. Corp., No. 02 Civ. 5159, 2004 WL 1962074, at *11 (S.D.N.Y. Sept. 2, 2004). The plaintiff must first demonstrate a prima facie case of discriminatory discharge, by establishing that (1) she belongs to a protected class, (2) she was performing her duties satisfactorily, (3) she was discharged, and (4) her discharge occurred in circumstances that give rise to an inference of discrimination based on her membership in that class. McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). The burden at the prima facie stage is de minimis. Id. at 134. After the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the plaintiff's termination. See McDonnell, 411 U.S. at 802. Finally, if the defendant

---

[8] A more liberal standard applies to NYCAC §8-130. See McQueen-Sterling v. United Healthcare Grp., Inc., 08 Civ. 4885, 2010 WL 768941, at *6 (S.D.N.Y. Mar. 8, 2010).

has met this burden of production, the plaintiff must produce some evidence that this proffered reason is in fact a pretext for discrimination. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). "Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' or by reliance on the evidence comprising the prima facie case, without more." Chambers, 43 F.3d at 38 (citations omitted). The ultimate burden of persuasion, however, at all times remains with the plaintiff.

Here, the Bank argues that (1) Jankousky has failed to make out a prima facie case of sex discrimination because the circumstances (i.e., Santamaria's gender-neutral hiring and firing decisions; the absence of any sex-based remarks; and Jankousky's failure to complain to her supervisors or human resources) negate an inference of discrimination; and (2) it terminated Jankousky for the valid, nondiscriminatory reason that she had a history of insubordination. Jankousky argues that there is sufficient evidence to support an inference of discrimination and that the Bank's proffered reason is pretextual. She disputes her alleged insubordination and further argues that, considering her objective success in business development and Santamaria's more lenient treatment of male branch managers, the type of mistakes she allegedly committed should not have resulted in her termination.

Jankousky has made out a prima facie case of discrimination. The Bank has stated sufficient reasons for termination, negating an inference of discrimination. But several genuine disputes of fact prevent the granting of summary judgment. There are bona fide questions about Jankousky's 2006 job performance. For example, did she mishandle Customer L's account; did she repeatedly grant fee refund accommodations to customers with low balances and overdraft activity, flouting Santamaria's directions; did she violate proper banking procedures for handling stop payment requests; did she honor overdrafts on an account with a $0 balance that was already overdrawn; and did she fail to discipline employees for falsifying documents in order to earn incentives? (See

Santamaria Aff. ¶¶21-35). Even if she did all these things, were they the true reasons for her termination?

There are also legitimate factual questions as to whether Santamaria treated female employees differently than males. The Bank contends that he has a neutral hiring and firing record, (Def.'s Mem. 4); while Jankousky asserts that he ranked and disciplined men more favorably, and was condescending towards female bank managers. (Pl. Opp. 56.1 ¶¶ 96, 97, 101; Pl.'s Mem. in Opp. 6-7; Forbes Aff. ¶ 5 (providing third party witness testimony that Santamaria was dismissive of female branch managers' suggestions); Goodell Supp. Aff. Ex. 37 (Santamaria's note to Jankousky's file in which he wonders whether she manages the branch "on emotions"); see Price-Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (holding that remarks based on sex stereotypes, though not dispositive, may be evidence of discrimination); Sassaman v. Gamache, 566 F.3d 307, 312-13 (2d Cir. 2009). Finally, Jankousky argues that the timing of her annual performance review(where unsatisfactory performance was first suggested) two weeks after she complained about her incentive compensation demonstrates pretext.[9]

The presence of these factual questions (and others) prevents the granting of a motion for summary judgment. Accordingly, the Bank's motion for summary judgment must be denied.

Dated: New York, New York
       March 23, 2011

                                              SO ORDERED

                                              */s/ Paul A. Crotty*
                                              _____
                                              PAUL A. CROTTY
                                              United States District Judge

---

[9] The Bank alludes to a Burlington-Ellerth defense based on Jankousky's failure to take advantage of reasonable corrective opportunities by complaining to her supervisors or human resources. This defense, however, applies only to hostile work environment claims, not wrongful discharge. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998) ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge . . . ."). In addition, the Bank has offered no evidence that it had such a procedure for dealing with complaints of wrongful discharge, as opposed to sexual harassment. Indeed, it is hard to imagine why any employer would have a procedure to question its own decision to terminate an employee.